[Civ. No. 9326. Second Appellate District, Division Two.—November 13, 1933.]

In the Matter of the Estate of ALICE PARRISH, Deceased. MATILDA A. WRIGHT, Appellant, v. THERESA M. DeFOSSET et al., Respondents.

Anne O'Keefe and John C. Curren for Appellant.

C. T. Vincent and J. J. Laton for Respondents.

STEPHENS, P. J.—This is an appeal from a judgment of the superior court in which a purported will of Alice Parrish, deceased, was declared invalid. The proponent of the will, Matilda A. Wright, who was both a specific and the sole residuary legatee, as well as the executrix by the terms of the instrument, is the appellant. The respondents are nephews and a niece of deceased, and were the contestants below. ██ The case was tried by the court without a jury, and briefly the findings are to the effect that the purported will, although signed by decedent, re-

sulted from the fraud of the proponent and John P. Roche, one of the witnesses to it.

The terms of the proposed will (which we shall hereinafter generally refer to as the will) gave $1,000 each to Maud T. DeFosset, a niece, and Oliver Walker, a nephew, and $2,000 to Matilda A. Wright, sometimes referred to as Mrs. Wright. The writing designated Mrs. Wright as "my beloved nurse". One dollar is left to each of any other lineal heirs who might establish themselves as such. The estate may be taken as of a value around $10,000, under depressed times. Mrs. Wright had been in the employ of Mrs. Parrish for some six months as housekeeper and personal attendant. Mrs. Parrish was unwell during all of this time, and several months before her death suffered a paralytic stroke which disabled her left arm and hand and her right leg. At this time she was about eighty-one years old. Thereafter she sat in a chair throughout the daytime. Shortly before her death she suffered another stroke. The housekeeper had not known Mrs. Parrish before the service began. John P. Roche claims to have had a slight acquaintance with Mrs. Parrish before Mrs. Wright's employment, though there is testimony in the case to the contrary. He appeared at the residence of deceased several times, and according to some testimony was quite friendly with Mrs. Wright. On one occasion after the first stroke, according to his testimony, Mrs. Parrish spoke to Roche about taxes and a will. She complained that a Mr. Johnson, who had advised her in a business way, had not responded to her request to draw a will. After some conversation Roche agreed to draw her will, and secured the data. He wrote it out on a typewriter and later brought his neighbor, a Mr. Sellars, to the Parrish home, where the instrument was signed by Mrs. Parrish and by Roche and Sellars as witnesses. Thereafter Roche put the will in his office safe. This, according to him, was at Mrs. Parrish's request, coupled with a request for complete secrecy of the whole transaction. Mrs. Wright was in the house when the will was signed, but did not come into the room with the other three. She claims that she knew nothing about the drawing of the will and that she did not know she was a beneficiary until after the death of its maker. There is testimony that Mrs. Parrish had drawn

a will before these events occurred and that she had expressed a desire to make changes therein. It also appears that the incinerator of a neighbor was habitually used by Mrs. Wright, but that a short time before the passing of Mrs. Parrish—according to one witness, two days before the funeral—a small stove was put up on the Parrish premises and a lot of papers belonging to decedent were burned. Mrs. Wright says these papers had been separated from others by Mrs. Parrish and that she had been instructed to discard them. It is undenied that a small bag was kept by Mrs. Parrish almost constantly within her reach, that in it were papers, keys, etc., and that this bag appeared almost empty immediately after her death.

Several neighbors had been in the habit of dropping in on Mrs. Parrish during her lifetime, and they are unanimous in their testimony that Mrs. Wright was not gentle or considerate of the deceased and that Mrs. Parrish often spoke of her with dislike. Some of the neighbors also say that Mrs. Wright spoke disrespectfully of her employer. Mrs. Wright says she was not called "nurse", but the will, as we have seen, refers to her as "my beloved nurse". Several witnesses speak of Mrs. Parrish's crying, and one witness testified as follows as to a conversation with her: "She [Mrs. Parrish] says, 'Do you know what they made me do?' 'No, I don't know what they made you do; what was it?' She says, 'They made me sign a paper.' I says, 'Who made you sign a paper?' 'They did.' I says, 'Where did you sign your paper?' She says, 'They pushed me up there to that table,' and I says, 'And you don't know what you signed?' 'No, I don't know what I signed,' and she commenced to cry and she says, 'I am afraid I have signed my home away and I will die in the poorhouse,'· and I said, 'Why, Mrs. Parrish, whatever made you do a thing like that?' and she says, 'Well, if you were afraid of them as I am you would do anything; I am helpless.' Directly so and she cried and she cried, and I says, 'I would not stand for it, but who are they and who were you talking about? Who come in here and done that?' 'Why,' she says, '[Her] sweetheart and her beau.' I says, 'Who are they; what is his name?' and she says, 'Mr. Roche.'" Decedent's nephews had not paid a great deal of attention to her, and Roche testified that Mrs. Parrish wanted to leave

but one dollar to Lewis J. Walker because of some misunderstandings between them. Mrs. DeFosset, the niece, had lived with Mrs. Parrish some years ago and had corresponded with her, though there was a period of several years when the correspondence lagged or ceased. However, they were corresponding cordially during the last months of decedent's life. There is testimony to the effect that Mrs. Parrish at one time referred to a will she had drawn, and that someone had tried to force her to sign another will. Neighbors' testimony also is to the effect that she had mentioned the propriety of her leaving her property to her niece. The testimony further shows that during the last few weeks of Mrs. Parrish's life Mrs. Wright discouraged the neighbors' calls, and that the latter did not communicate with them as to the serious nature of her employer's illness.

The court found that Mrs. Parrish was sound of mind though mentally and physically weakened, and that she was imposed upon by Mrs. Wright and Roche. It is proper here to state that the evidence does not justify any serious criticism of the witness Sellars. He merely accompanied Roche to the Parrish home and there witnessed the will. The examination of Roche in court indicated that he was quite hard of hearing. The findings indicate that the court believed that the instrument was not the will of deceased, but that its terms were fraudulently written to benefit Mrs. Wright. The court quite pointedly examined Roche as to the unusual situation of a sick woman leaving a comparatively small sum to her nearest kin and handsomely remembering her housekeeper of but a few months' acquaintance. We may add that the unusual situation is not helped by the fact that there were some unpleasant differences between the two during those months and that the testimony is almost if not quite conclusive that no degree of affection grew up between these elderly women.

It seems to us the opportunity for enforcing the will of Mrs. Wright upon the sick woman was present. The evidence is remarkably clear that the whole business of making the will was kept within the housekeeper's circle and away from anyone who had known decedent upon a friendly basis. There is more than suspicion in this case, and the unusual events rise to the dignity of circumstantial evi-

dence. (*Estate of Gallo,* 61 Cal. App. 163, 165 [214 Pac. 496].) The cases upon this point are considered in *Estate of Hamburger,* 126 Cal. App. 455 [14 Pac. (2d) 802].

The court found that decedent's mind was in a weakened condition. Appellant thinks she was misled during the trial by the court when it declared that the allegation of decedent's incompetence to make a will was not sustained by the evidence. · But incompetence of a mind to make a will and a weakened mind are quite different.

Appellant also claims that the findings are inconsistent, as in one instance the court finds that decedent did not subscribe her name to the alleged will and in other parts of the findings it is found that she did so. It is true there is this inconsistency, but it is perfectly clear from a reading of the complete finding of fact that the court did determine that decedent signed the document presented for probate in the presence of the subscribing witnesses, but that it was not her voluntary act, and that she did not knowingly sign the proffered instrument as her last will and testament.

The evidence supports the findings and the judgment is affirmed.

Craig, J., and Archbald, J., *pro tem.,* concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 12, 1934.